UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 4:14CR00310-1 |
| | ) | |
| LUQUOISE CLAY, | ) | |
| | ) | |
| Defendant. | ) | |

## LUQUOISE CLAY'S SENTENCING MEMORANDUM

COMES NOW LUQUOISE CLAY, by and through undersigned counsel, and submits this Sentencing Memorandum to assist this Honorable Court in fashioning a sentence that is "sufficient, but not greater than necessary" pursuant to the factors enumerated under 18 § U.S.C. 3553(a):

## STATEMENT OF FACTS

### A. Nature and Circumstances of the Offense

In late 2011, Luquoise Clay's (now former) boyfriend and co-defendant, Wayne Jackson, was part owner of a store called "Wayne's World" in LaGrange, Georgia, which engaged in the illegal purchase of WIC vouchers. At that time, Jackson sought to open a new store in LaGrange named "Small Mart" for the ostensible purpose of selling WIC-approved items in exchange for WIC vouchers. However, Jackson was concerned that if he disclosed his ownership interest in Small Mart, his criminal record would prevent the store from receiving approval as a WIC vendor. Accordingly, Jackson asked Clay (who had no criminal history) if he could open Small Mart in her name. Jackson told Clay that Small Mart would operate as a "legitimate" store and

1

would not purchase WIC vouchers illegally.  Based on Jackson's initial assurances to Clay in that regard, Clay agreed to prepare and submit Small Mart's WIC application as if she were the owner of the store, even though Clay did not actually own any interest in Small Mart. Thereafter, Clay completed a WIC training course in January 2012, and Small Mart was approved as a WIC vendor in or around February 2012.  Though Clay had been working as a hostess and housekeeper at the Marriott Hotel since 2006, she succumbed to Jackson's request that she leave the Marriott and work for Small Mart for similar pay. Clay's wages as an employee of Small Mart were only slightly higher than what she was paid at the Marriott.

It is stressed that at no time did Small Mart ever engage in any illegal purchases of WIC vouchers; however, Small Mart ultimately served as a "front" to process WIC vouchers that Jackson and others illegally obtained through Wayne's World and elsewhere.  Jackson bestowed Clay with a "manager" title at Small Mart; however, in reality, Clay had no independent authority and acted at Jackson's direction at all times.   Small Mart had only one other employee besides Jackson and Clay: Jessica Cameron.  Clay would occasionally help Cameron with printing fake store receipts for Small Mart at Jackson's direction.  Additionally, Clay would sometimes deposit the processed WIC vouchers into various accounts at Jackson's request. However, Clay's primary duties at the store involved inventory related matters and bookkeeping.

### B. Defendant Characteristics and Family Ties

Clay is a 31-year-old single mother of three minor daughters: K.C. who is 14, J.C. who is 10 and M.D. who is 8.  Clay and her daughters reside together at 929 Society Circle S.W., Atlanta, GA 30331.  Clay is the sole caregiver and financial supporter for her three daughters, and all three of the girls have lived with Clay since birth.    Clay presently works as a housekeeper at the W Hotel in Atlanta to support her family, and she has maintained steady

employment in the hotel industry since 2006 (except, of course, for the period of time when Clay was working as an employee of Small Mart).

K.C.'s father, Kelvin Armour, does not regularly participate in K.C.'s life and he pays no child support.   J.C.'s and M.D.'s father, Marque Davis, was murdered in a home invasion in 2012.  Importantly, J.C. and M.D. undergo grief counseling with a psychologist in Atlanta due to the trauma surrounding their father's death.  Obviously, given these circumstances, Clay plays a significant role in each of her daughters' lives, and there is not a person on earth who is closer to these children than their mother.  To be sure, the children's attachment to and dependence on their mother is best substantiated by the fact that they have _never been apart from Clay for longer than a weekend_.

All three of Clay's daughters attend Atlanta Heights Charter School.  Clay drives the children to and from school every day.  It is noteworthy that none of the children have missed a day of school this year, and the girls have been tardy on only two occasions.    Moreover, Clay helps each child with homework and school assignments, and she even volunteers in the children's classrooms from time to time.  Importantly, two teachers at Atlanta Heights, Tammy Parrish and Keun Moore, have written letters of support for Clay which are attached hereto as Exhibits "A" and "B," respectively.

Clay's oldest daughter, K.C., is in the eighth grade.  K.C. has attended Atlanta Heights Charter School since fourth grade; she attended William Scott Elementary prior.  According to Clay, K.C. is a straight-A student and she is one of the top players for Atlanta Heights' basketball team.  Clay serves as team mother for K.C.'s team.  K.C. was recently selected by her teacher as a "Star Student" for the month of August 2014 in light of her "wonderful attitude and academic performance." See Copy of School Newsletter, attached hereto as Exhibit "C."   In

connection therewith, K.C.'s teacher observed that K.C. "always completes her assignments in a timely fashion and is willing to assist other students." K.C. loves going out to eat and to movies with her mother and her sisters. K.C. also likes to help Clay with cooking and do-it-yourself home improvement projects around the house.

Clay's middle daughter, J.C., is in the fourth grade. She has attended Atlanta Heights since kindergarten. According to Clay, J.C. is making A's and B's in school. J.C. has experienced some difficulty in focusing her attention because of ADHD, but J.C. is now on medication which has helped a great deal. J.C. participates in her school's Girl Scout troop and she loves fashion. Clay and J.C. enjoy spending time together playing with dolls, playing in the park and working on homework.

Clay's youngest daughter, M.D., is in the second grade. M.D. has attended Atlanta Heights since kindergarten. Clay advised that M.D. is also an A and B student. Like J.C., M.D. has been diagnosed with ADHD, but medication has significantly improved her focus. M.D. is also a member of her school's Girl Scout troop and she runs track at the Adamsville Recreational Center in Atlanta. M.D. is showing a lot of promise in her athleticism, having already competed in track at the state level. When Clay is not helping M.D. train for track, she spends time with this daughter coloring, working on puzzles and polishing each other's fingernails.

Should Clay be sentenced to incarceration in this case, there are no suitable family members available to look after Clay's daughters. As noted above, K.C.'s father, Kelvin Armour, is not a regular part of K.C.'s life. He is unemployed and in and out of jail. J.C.'s and M.D.'s father, Marque Davis, was murdered. Clay's mother is an alcoholic and suffers from bi-polar disorder. Clay's father, Howard Clay, is wheelchair-bound and lives in a one-bedroom unit in High Tower Manor, a senior citizens' assisted living facility operated by the Atlanta Housing

Authority. Moreover, he is on disability and cannot afford to provide for the kids.   Clay's half-brother, Randy Jackson, had initially agreed to take care of the children, but he subsequently lost his job and has reneged on his offer.   Likewise, Clay's half brother Reginald Andrews has declined to take care of the children due to his employment, which frequently requires him to travel out of town for extended periods of time.

### C. Post-Offense Conduct and Cooperation

From the outset, Clay has acknowledged that her actions at Small Mart were illegal and wrong.  Notably, after law enforcement raided the store in December 2012, Clay voluntarily met with Agent Doug Bridges for an interview.  In doing so, Clay was candid and forthcoming about every aspect of her involvement at Small Mart .  Thereafter, Clay testified before the Grand Jury, where she was again open and informative with the Government.   Once the U.S. Attorney's Office offered Clay the instant plea agreement, she promptly accepted it after consulting with counsel.  In connection therewith, Clay agreed to provide a proffer to assist the Government with the prosecution of others involved in the conspiracy.  After the plea was entered, Clay met with Agent Bridges again along with an investigator from the U.S. Attorney's Office to provide her detailed proffer.  During that interview, Clay again owned up to her actions at Small Mart and likewise provided substantial and meaningful information that has assisted the Government in prosecuting Clay's co-defendants.   It stands to reason that the information Clay provided during her initial meeting with Bridges and subsequent proffer assisted in procuring guilty pleas from both Jackson and Cameron in this case.  Moreover, Clay remains prepared to testify on the Government's behalf at trial for the remaining defendants.

## ARGUMENT AND CITATION OF AUTHORITY

This Court is familiar with the mandatory sentencing considerations set forth in 18 U.S.C. § 3553(a) which include "the nature and circumstances of the offense and the history and characteristics of the defendant;" the need for the sentence to punish and deter the defendant and to protect the public from the defendant's future crimes; the kinds of sentences available; the Sentencing Commission's policy statements; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims of the offense. Id. Application of those factors in this case dictates that a sentence of probation with special conditions of home confinement and/or intermittent confinement in a local jail, as opposed to traditional incarceration, satisfies the standard of "sufficient, but not greater than necessary" in achieving the stated purposes of punishment, deterrence and public protection from further crimes. Id.

**I.      The circumstance of the crime, the absence of a prior criminal history and Clay's personal characteristics indicate that Clay will not recidivate.**

The nature and circumstance of Clay's offense, coupled with the "history and characteristics" considerations under § 3553(a)(1) suggest that recidivism is highly unlikely for Clay; thus, the need for Clay's sentence to serve as a deterrent or to protect the public against "further crimes" as contemplated in § 3553(a)(2)(B) and (C) is negligible. To this point, the Sentencing Commission has observed that a defendant's criminal history (or lack thereof) serves as a predictor of recidivism; also, the Sentencing Commission published a study that identifies other offender characteristics affecting recidivism, including, *inter alia*, sex/gender, employment status, age, and illicit drug use. See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, United States Sentencing Commission (May 2004). According to the Sentencing Commission, defendants with no prior criminal history are less

likely to recidivate. Id. Likewise, women are less likely to recidivate than men; older defendants are less likely to recidivate than younger defendants; defendants with stable employment are less likely to recidivate than unemployed defendants; and those who do not abuse illegal drugs are less likely to recidivate than those that do. Id.

With respect to the nature and circumstances of the offense, it should be noted that Clay's behavior underlying this crime was completely out of character. The lack of any prior criminal history whatsoever buttresses this point. Indeed, Clay would never have been involved in this conspiracy absent Wayne Jackson's abuse of her loyalty and trust. Unlike the other co-defendants, Clay's participation in this scheme was not motivated by monetary gain or financial considerations; rather, she simply got sucked into it through her efforts to appease the man she loved. Notably, in his interviews with investigators, Jackson fully acknowledged his role in introducing Clay to the conspiracy, which began when Jackson exploited Clay's squeaky clean record in furtherance of his own criminal objectives. See PSI Report, Page 13, Paragraph 16. Fortunately, Jackson is no longer a part of Clay's life, which means she is no longer subject to Jackson's manipulation and negative influence which might otherwise give rise to future crimes. Thus, the unique circumstances of this offense and Clay's lack of a prior criminal history both serve to assure this Court that Clay will not recidivate.

As to the issue of sex/gender, the fact that Clay is a female (and the sole caregiver for her three girls) likewise weighs against the likelihood of recidivism here. On this point, one scholar commented that

> Existing data indicate that women's lower recidivism rate may be connected to their family and childcare responsibilities....Because of the sparseness of federal women's prisons, most of the women are housed far away from their families, making it more difficult for them to stay in regular, close contact with their children. Longer prison terms often automatically end parental rights. On the other hand, children of incarcerated parents are more likely to experience a host of

negative consequences, including a greater likelihood of going to prison themselves.

Nora V. Demleitner, Smart Public Policy: Replacing Imprisonment with Targeted Non-Prison Sentences and Collateral Sanctions, 58 Stan. L. Rev. 338, 352 (2005).

Those observations certainly ring true for Clay in this case. Indeed, Clay recognizes that she is the only person who her daughters can depend on for unconditional love and support. Clay works 40 hours a week as a housekeeper in order to provide for her family. She has placed her children in a reputable charter school, Atlanta Heights, where they have each excelled and are on track to become successful and productive members of society. Clay is involved in each of her daughters' lives from the moment they wake up until the moment they go to bed. She takes the children to school, volunteers in their classrooms, helps with their schoolwork, and drives them to sports practices and games. Clay cooks for the children and takes them out to eat at restaurants. Clay entertains each of her daughters in uniquely special ways, from playing with puzzles to polishing nails. Clay teaches, disciplines, and encourages her children and serves as a positive role model, as is best evidenced in the letters of support from Tammy Parish and Keun Moore. Clay knows that if she is permitted to continue to provide for her daughters by virtue of a non-incarceration sentence, any future misconduct on Clay's part would effectively end her ability to care for and support her girls or be involved in their life in any meaningful way. Clay fears that if that happens, her children may wander astray and fall into a life of crime. Undeniably, the very real threat of losing her daughters and the associated negative consequences that would have on the girls' upbringing in her absence serve as a more than sufficient deterrent for Clay in this case.

Additionally, Clay's age, employment status, and lack of drug use all suggest that Clay will not recidivate. With respect to age, studies performed by the Sentencing Commission show

that defendants like Clay, who are in criminal history category I and are between the ages of 31 to 35 have a lower recidivism rate (14.6% ) than defendants with similar criminal histories who are under 21 years of age (29.5%).   See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, p. 28, United States Sentencing Commission (May 2004).    Likewise, Clay has been steadily employed throughout her adult life and is presently employed full time.   According to the Sentencing Commission, those with stable employment are less likely to recidivate (19.6%) than those who are unemployed (32.4%). Id. Additionally, Clay has no history of illegal drug use.   The Sentencing Commission has determined that defendants who have not used illegal drugs within one year prior to the offense in question have a lower recidivism rate ((17.4%) than those who do (31.0%).

Finally, Clay's assistance to the Government in this case further demonstrates that she is unlikely to recidivate.   As noted above, Clay has cooperated with Agent Bridges since the investigation began.   She has provided substantial information to assist the Government with prosecuting co-defendants, including, but not limited to, Wayne Jackson and Jessica Cameron, who have both pled guilty.   Presumably, Jackson and Cameron's guilty pleas were due in part to the information provided by Clay.   Clay now stands ready to testify at the trial of the remaining co-defendants if called upon by the Government.    All of Clay's actions in this regard show acceptance of responsibility and evidence her rehabilitation, which minimizes the likelihood of Clay engaging in additional crimes in the future.

**II.     A non-incarceration sentence will serve the purpose of punishment and is consistent with the Sentencing Commissions' Policy Statements regarding family ties and responsibilities.**

Because the likelihood of recidivism is so low in this case, the Court's priority in sentencing Clay should be punishment as opposed to deterrence or public protection. In tailoring its sentence, the Court is required to review the available sentencing options pursuant to 18 U.S.C. § 3553(a)(3). Though the Probation Office has recommended a sentence of incarceration in this case, any term of imprisonment will be absolutely disastrous to Clay's family. A better alternative to incarceration in light of Clay's family responsibilities is a sentence of probation with the conditions of home detention and /or intermittent confinement. It is noteworthy that the Sentencing Commission recognizes that home detention is a substitute for imprisonment. See U.S.S.G. § 5F1.2. Moreover, to the extent this Honorable Court believes that home detention alone will not evoke a sufficient punitive effect, the Court may impose a condition of intermittent confinement to be served in a local jail during specified intervals of time (weekends, etc.). Such a sentence would be sufficient to punish Clay, but not greater than necessary, and it would permit Clay to fulfill her child rearing responsibilities and keep her family intact.

While the Sentencing Guidelines are no longer mandatory, it is significant that the Sentencing Commission issued a policy statement recognizing that a defendant's family ties and responsibilities may be grounds for a departure in extraordinary cases such as this one. U.S.S.G. § 5H1.6. In the Application Notes for § 5H1.6, the Sentencing Commission directs the Court to consider whether: (1) the defendant's sentence "will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family", (2) "[t]he loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant," (3) "[t]he loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making

the defendant's caretaking or financial support irreplaceable to the defendant's family, and (4) "[t]he departure effectively will address the loss of caretaking or financial support". Id.

Importantly, the Probation Office indicated the applicability of § 5H1.6 in Clay's PSI Report under the heading "Factors that May Warranty Departure," and Clay obviously agrees with the Probation Office's assessment in that regard. As noted, a sentence of incarceration for Clay in this case will cause a "substantial, direct and specific loss" of essential caretaking and financial support for her three daughters, and there are no other family members who can step in and fulfill these roles for the children. Because there are no substitutes for Clay, the loss of caretaking and financial support "substantially exceeds" the harm ordinarily incident to incarceration for other defendants. Indeed, a sentence of incarceration in this case will completely uproot Clay's children and have a devastating impact on their lives—they will be taken from their mother, who is the family's only anchor. The three children will be unable to even visit Clay because there no federal women's prisons nearby; they will be forced to live with strangers since no family members are able or willing to care for them and support them. In addition, they will be plucked from an excellent charter school where they have demonstrated success as students and athletes, and they will be removed from their friends and social circles. Undeniably, these experiences will generate grave emotional and mental consequences for the children, especially the youngest and most vulnerable, J.C. and M.D., who are still grieving the death of their murdered father. Further, there are no "remedial or ameliorative programs reasonably available" to offset the loss of Clay's caretaking and support of her children, and no one can dispute that Clay plays an "irreplaceable" role in the care and support for her family. Finally, a sentence of probation with conditions of home detention or intermittent confinement "effectively will address the loss of caretaking or financial support" because it will permit the

children to remain in the custody of their mother at their home in Atlanta and will likewise allow Clay to continue working in order to support them.

In the event this Honorable Court is not inclined to sentence Clay to impose conditions of home detention or intermittent confinement, another viable sentencing alternative is a sentence of probation with a special condition that the defendant reside in a community treatment center or halfway house. U.S.S.G. § 5F1.1. While such a sentence would not be as desirable to Clay because it fails to address the loss of caretaking that will occur if Clay is forced to live apart from her children, it nevertheless would potentially allow Clay to remain in Atlanta (possibly the Dismas House). Although separated and residing in a Bureau of Prisons contract facility, she could maintain a close, personal supportive relationship her daughters; furthermore, this sentence would also permit Clay to continue to work and continue the financial support to her family.

**III.    Clay's unique personal circumstances warrant a different sentence than those imposed on her co-defendants.**

Among the others factors listed in § 3553(a), the one most often argued by the Government is the need to avoid unwarranted sentencing disparities. The concern, though, is with those disparities that are *unwarranted*. United States v. Owens, 464 F.3d 1252, 1256 (11th Cir. 2006); See also 18 U.S.C. § 3553(a)(6)(". . .the need to avoid *unwarranted* sentence disparities.")(emphasis added); United States v. Duncan, 479 F.3d 924, 929 (7th Cir. 2007) ("18 U.S.C. § 3553(a)(6) does not instruct district courts to avoid all differences in sentencing, only unwarranted disparities."). To impose the same sort of sentence on Clay as those whose involvement was driven solely by monetary profit, who lack the family responsibilities of Clay, who have not made sincere efforts to rehabilitate themselves, and who run a significant risk of recidivism is a false equality that ignores the facts. Section 3553(a) gives this Court discretion to

consider the differences in Clay's personal circumstances compared to those of her co-defendants and other similarly situated defendants. As discussed at length in the preceding sections of this brief, Clay's personal circumstances demand a non-incarceration sentence for Clay, notwithstanding what this Court may have chosen to do in connection with the other defendants. Thus, any perceived disparity in this case would qualify as "warranted" within the meaning of § 3553(a)(6).

## CONCLUSION

Even when the Sentencing Guidelines were mandatory, sentencing courts were expected to treat those before them as individuals. *See* Koon v. United States, 518 U.S. 81, 113 (1996)("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). In light of the Booker, Rita, Kimbrough, and Gall decisions and § 3553(a)'s command to impose a sentence that is "sufficient, but not greater than necessary," courts now have much greater latitude in fashioning sentences that fit not only the crime, but the individual circumstances of the people who committed it. Clay respectfully implores this Court to exercise that discretion and to impose a probation sentence for Clay that requires home detention and/or intermittent confinement, or in the alternative, community confinement instead of prison. This type sentence will effectively punish Clay, while allowing her to continue to be a mother to her three children and provide for their care and support.

WHEREFORE, Clay respectfully requests that this Honorable Court reject the Probation Office's recommendation of a sentence of imprisonment and instead enter a sentence of probation with the conditions of home detention and/or intermittent confinement or in the

alternative, community confinement, with a recommendation for placement at the Dismas House

or some other halfway house in the Atlanta, Georgia area.


Respectfully submitted this 8th day of February, 2015.

                              **BRANNEN, SEARCY & SMITH, LLP**

                    By:    /s/ Robert C. Hughes, III
                           **ROBERT C. HUGHES, III**
P.O. Box 8002               Georgia State Bar Number 140993
Savannah, GA 31412          ATTORNEYS FOR DEFENDANT
(912) 234-8875 (p)          LUQUOISE CLAY
(912) 232-1792 (f)
rhughes@brannenlaw.com

**EXHIBIT A**

February 5, 2015

Re:  On behalf of Luquoise Clay

To whom it may concern:

    My name is Tammy Parrish, 7th and 8th grade math teacher at Atlanta Heights Charter School in Atlanta, Georgia.  I am sending this letter on behalf of Luquoise Clay.  I have known her since August 2015, the month and year, I started teaching at Atlanta Heights Charter School.  I met her at the beginning of the school year during conference time for her three young daughters.  It was recognized immediately why K████████ was the strong and determined young lady that I have the pleasure of teaching 8th grade math.  K████████ has a 3.5 GPA on a 3.0 scale and continues to strive for perfection.

    Ms. Clay is very attentive to her younger daughters, J██████, and M████, to ensure that they stay on the right path in school as the big sister.  The girls have participated in Girl Scouts and other various school activities in which Ms. Clay is always in attendance.  She is a pillar of strength for her kids.  She is actively involved in all school activities and is always at the school checking on her girl's grades and behavior.   She is the team mom for the basketball team and she is a very active parent in all school related activities.  She works very hard to provide for her kids and exemplifies the true character of what a loving, caring, genuine mother is composed of.   She has taught them the meaning of respect for others as well as themselves.  She is actively involved with projects and homework, especially, J██████ and M████  She extends her guidance outside of the school and home by doing fun things with them as a family.  She has shown great interest in her children's well-being by being very supportive in all they do. She has been very helpful with making sure that her children are excelling in all classes by showing up to tutoring with her children and being active with teachers via telephone or face to face.   She shows great interest in positive things and uses less than positive issues as a time to teach her children right from wrong.  Even when being challenged with difficulties in her life, she still remains to be very positive

and does not show any form of negativity.  Luquoise Clay is truly a great person and I am very happy that these girls have a strong and determined role model in their lives.

Ms. Clay has been afforded the opportunity to make a difference in her children's lives and she takes pride in that.  In this neighborhood, I have seen many students that do not have that same support, guidance, and strength that is displayed every time those girls see their mom in the school. These girls are her world, and on her behalf, anything that would break this unit up will be devastating to not only Ms. Clay, but her 3 beautiful girls, who would not be able to survive in any other environment, circumstance or outcome.

I can be reached via email 84.tparrish@nhaschools.com, tammysparrish@gmail.com, 404 886-2147 cell, or 404 472- 3003 Room #14 work, if there is anything that I may be able to say or be asked questions on Ms. Clay's behalf.

Respectfully,


Tammy S. Parrish, MBA

7th/ 8th Grade Mathematics

Atlanta Heights Charter School

**EXHIBIT B**

# ATLANTA HEIGHTS CHARTER SCHOOL
A PUBLIC CHARTER SCHOOL MANAGED
BY NATIONAL HERITAGE ACADEMIES

Keun Moore
Atlanta Heights Charter School
3712 Martin Luther King Jr. Dr. SW
Atlanta, GA 30331
February 12, 2015

To Whom It May Concern:

Hello. I am writing in reference to Luquoise Clay, who is appearing before your court due to her sentencing.

Ms. Clay asked me to write a character reference letter. I feel strongly about Ms Clay, and about her future, and I want to try to make you feel the same way.

Ms. Clay is a person of good moral character. I realize that might seem hard to believe, given the circumstances, but it's true nonetheless. I have known Ms. Clay for 5 months, and in that little time I have seen her go through ups and downs, but all the while I have been convinced that she is a decent person at the core. She is outstanding mother to her children and is very involved in their education. She is very supportive to my classroom, and vital addition to my class.

Ms. Clay has made a mistake, and she is incredibly remorseful, and is willing to do whatever it takes to make reparations, financially and emotionally, if possible. But to do that, she needs you to give her an opportunity to get a second chance. I recognize that Ms. Clay broke the law, and I do not believe that she should get off without punishment. I just hope you will recognize the power you wield with regard to the future of this woman, and make a fair decision.

Feel free to contact me at via email at 84.kmoore@hnaschools.com with any questions or to discuss Ms. Clay

Sincerely,

Keun Moore

2nd grade Teacher

12 MARTIN LUTHER KING JR BLVD  •  ATLANTA, GA 30331
4 472 3003 OFFICE  •  678 264 2132 FAX
LANTAHEIGHTSCHARTERSCHOOL.ORG

**EXHIBIT C**



# The Cajun Connection

VOLUME 1, ISSUE 1                    SEPTEMBER 2014

## September Salutes Successful Students

"If you want success, you have to be willing to do more than the next person."

~Ms. Frazier

Ms. Frazier has welcomed new students to her world of literature. During the past month, she has introduced them to new practices and the importance of organization. Some students have taken a bit longer to grasp the routine, while others have soared to the top.

Organization is a very important skill to possess. In many ways, taking the time to bring order to our lives in various ways can make things easier for us in the long run.

Why Is organization so important?

- Because getting organized will help you:
  be more successful
- be more productive at work

- be more creative
- be more efficient
- save time & money
- increase your self-esteem
- do things well & calmly
- have more free time
- feel better
- live in a clean atmosphere
- live longer
- increase enjoyment
- relax & eliminate stress

In many ways, being organized can lead to student success. When students master the art of organization, they find they won't forget assignments or lose them.

Create time to get organized and compare the difference in academic performance.






**Ka̶t̶h̶e̶r̶i̶n̶e̶ C̶l̶a̶y̶**



**Ms. Frazier has selected two of her students as her Star Students from the month of August.**

K̶a̶t̶h̶e̶r̶i̶n̶e̶ C̶l̶a̶y̶ is in the 8th grade and was selected for her wonderful attitude and academic performance. She always completes her assignments in a timely fashion and is willing to assist other students.

**Khaleel Rouse** was selected for his changed behavior. Khaleel has done a complete turn around and is now a great member of the team and is improving academically as a result.

**Hats off to both students!**


**Khaleel Rouse**

www.frazierahcs2014.pbworks.com

PAGE 2

# Independent Reading=1, 000,000 words!

Many years ago, Ms. Frazier fell in love with a school initiative to promote reading 25 books for the school year. There are many benefits to this practice and Ms. Frazier will be encouraging this focus through the independent reading section of each class.

Research has shown that reading on a consistent basis:

*Improves vocabulary

*Encourages students to read for leisure

*Improves reading skills

*Increases vocabulary

Please review the reading pacing guide and consult the class webpage for more information regarding ways to earn credit.

September  30 – 2 Books

October  30 – 6 Books

November  24 – 9 Books

December  31 – 12 Books

January  29 – 15 Books

February 27 – 18 Books

March 31 – 21 Books

April 30 – 23 Books

May 14 – 25 Books

*"The more that you read, the more things you will know. The more that you learn, the more places you'll go." Dr. Seuss, I Can Read With My Eyes Shut!*

## Frazier's FAVS



**Maya Angelou**

- I Know Why the Caged Bird Sings

**S.E. Hinton**

- Rumble Fish

**Walter Dean Myers**

- Kick
- Hoops
- Slam

**John Steinbeck**

- The Red Pony
- Of Mice and Men

# DID YOU KNOW ABOUT CCGPS?



Each class is directed by a list of state standards known as the Common Core Standards.   These standards are designed to drive the daily instruction of each subject area.

The Georgia Department of Education defines the Common Core Standards as the measure to "provide a consistent framework to prepare students for success in college and/or the 21st century workplace. These standards represent a common sense next step from the Georgia Performance Standards (GPS)." These standards tell each student what they should know and be able to do on their respective grade levels.

Ms. Frazier assessed each student's ability to decode each standard and identify their daily learning objectives.  Each student has personalized the CCSS acronym which actually stands for Common Core State Standards to mean Common Core "STUDENT" Standards. This approach is meant to assist each student in making a personal connection to each grade level expectation. Ms. Frazier encourages each parent to quiz their students based on their daily standards.

### Why did Georgia adopt the Common Core State Standards?



Adopting the Common Core State Standards (CCSS) helps our teachers improve, better prepare students for success, and potentially yield long term financial savings for Georgia. First, while our GPS give our teachers an excellent tool to prepare our young people, we are always looking for opportunities to improve. The CCSS integrate much of the GPS, but also take them a step further, creating an opportunity to even better prepare our students for college and work.

Second, the CCSS allows for a meaningful comparison of our students' achievement with students in other states. Currently, states operate with different standards, making it impossible to accurately compare data nationally or internationally. Our students will be competing for jobs with students from all over the world. We must be able to compare ourselves to the rest of the U.S. and other countries to ensure that we are providing students with the tools they need to be competitive.

Third, the initiative allows for better purchasing power. Since participating states will have a consistent curriculum, textbook and instructional resource companies will be able to develop and target resources to one set of standards. This will help to reduce prices and ensure that funds are spent wisely.

-From the GADoE webpage


## http://www.corestandards.org/





# Instructional Focus

The first unit of the 2014-2015 school year in English Language Arts jumps right into the CCSS by examining the following:

**8th grade Reading:**

Informational Text and Literary Text

*1 extended text & short texts

**8th grade Writing:**

Argumentative and Narrative writing

**7th grade Reading:**

Literary Text and Informational Text

*1 extended text & 6 short texts

**7th grade Writing:**

* Informative/Explanatory & Narrative writing

Context Clues

Dialogue

Sensory Details

Author's Purpose

Cause and Effect

Plot Diagrams

Compare and Contrast



**According to definition, wisdom** is the ability to think and act using knowledge, experience, understanding, common sense, and insight. Wisdom has been regarded as one of four cardinal virtues; and as a virtue, it is a habit or disposition to perform the action with the highest degree of adequacy under any given circumstance.

Ms. Frazier will be challenging all students to reflect on what it means to be wise and why it is important to show evidence of wisdom in every day decision-making at Atlanta Heights.

## Moral Focus:  Wisdom

# Meet the New Principal

Ms. Noletha High serves as the new principal of Atlanta Heights Charter School for the 2014-2015 school year. She previously served as a principal of an elementary school in Atlanta, model teacher leader, instructional support specialist, and mathematics consultant. High also has experience teaching at the elementary, high school and college levels. She holds a master's degree in mathematics education and an educational specialist degree in educational leadership from Albany State University. She also earned a bachelor's degree in mathematics from Georgia State University.



## Meet the New Dean



The Atlanta Heights Charter School middle school team welcomes Dean Fisher to the team. Dean Fisher replaces Dean Smith for the 2014-2015 school year. Dean Fisher has a wealth of knowledge and a great passion for children.

Welcome Dean Fisher!



**Alisha Fisher, Ed. S** ● DEAN OF INTERVENTION
ATLANTA HEIGHTS CHARTER SCHOOL
3712 Martin Luther King Jr. Drive ● Atlanta, GA 30331
404.472.3003 PHONE   678.264.2132 FAX
84.afisher@nhaschools.com

## Meet the Team

| Ms. Clarisse Frazier, ED.S. | Mr. Brian Selph | Ms. Tammy Parrish | Ms. Carlon Marcelin |
|---|---|---|---|
| English Language Arts | Social Studies | Mathematics | Science |
| 84.cfrazier@nhaschools.com | 84.bselph@nhaschools.com | 84.tparrish@nhaschools.com | 84.cmarcelin@nhaschools.com |



**Love** Purple **, Live** Gold   by C. Frazier for B. Banks

It's often a question that burns within

For those who've never had a chance to see

What it really means to be a champion

And all LSU fans will certainly agree


That it is easy to look from the tv set

And "think" that your team has a shot

To rumble with the best in the land

And many of them give it all they've got


But when you are from the  great state of Louisiana

Greatness is just a part of a normal day

And being an alumni of Louisiana State University

Means there is absolutely, positively NO WAY


That any team could think or even dare to dream

To withstand the most deadly offense in the SEC

That will shock the likes of Wisconsin in the final quarter

And if you doubt it,  read the stats and challenge me


And for those who cheer for Alabama year after year

Surely this year, you realize we are coming for you

So bring the best you have on your line up this season

And when it's all over, you will have to admit that it's true


That LSU doesn't need a Nick Saban when its pride is inside

It's a love that most teams from Georgia will never know

For when you want to be a part of a winning team,

Louisiana State University is the ONLY WAY TO GEAUX!



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )
                           )
v.                         )        CASE NO. 4:14CR00310-1
                           )
LUQUOISE CLAY,             )
                           )
            Defendant.     )

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all parties in this case with the attached

Sentencing Memorandum in accordance with the directives from the Court Notice of Electronic

Filing ("NEF") which was generated as a result of this electronic filing.

This 8th day of February, 2015.

**BRANNEN, SEARCY & SMITH, LLP**


BY:   s/ Robert C. Hughes, III
      ROBERT C. HUGHES, III
      GA Bar No. 140993
      Attorneys for Luquoise Clay

Post Office Box 8002
Savannah, GA  31412
(912)234-8875
(o)912-234-8875
(f)912-232-1792
Email:  rhughes@brannenlaw.com

15